COURT CASE NO. 4866

# UNITED STATES COURT OF APPEALS
*for the*
# FOURTH CIRCUIT

### OBINNA FELIX UKWU

*Defendant-Appellant*

– v. –

### THE UNITED STATES OF AMERICA,

*Plaintiff-Appellee.*

ON APPEAL FROM THE DISTRICT OF MARYLAND
FOR A REVIEW OF THE EXTRAPOLATION
METHOD USED BY THE UNITED STATES TO
CALCULATE THE REVENUE LOST TO THE
UNITED STATES FROM TAX VIOLATIONS

# OPENING BRIEF FOR APPELLANT

BRUCE FEIN (D.C. Bar No. 446615)
BRUCE FEIN & ASSOCIATES, INC.
722 12th St. NW, 4th Floor
Washington, D.C. 20005
(703) 963-4968
(202) 478-1664 (fax)
bruce@thelichfieldgroup.com
*Counsel for Defendant-Appellant*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Defendant-Appellant, Obinna Felix Ukwu is a natural person and not a corporation.

# TABLE OF CONTENTS

Rule 26.1 Corporate Disclosure Statement..................................................... i

Table of Contents ............................................................................. ii

Table of Authorities........................................................................ iii

Jurisdictional Statement .......................................................... iv

Statement of Issue............................................................. 1

Statement of Case .......................................................... 2

Statement of Facts ....................................................... 3

Summary of Argument............................................ 9

Argument ........................................................ 12

Appellant's Request for Oral Argument............................. 18

Certificate of Service ................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Gall* v. *U.S.* 552 U.S. 38, 51 (2007)..........................................................16

*United States* v. *Butner*,
277 F.3d 481 (4th Cir.2002) ...............................................................12

*United States* v. *Mehta*,
594 F.3d 277 (4th Cir.),
*cert. denied*, 131 S. Ct. 279 (2010) ....... 1, 5, 6, 9, 10, 11, 12, 13, 14, 15, 16

*United States* v. *Schroeder*,
536 F.3d 746 (7th Cir.2008) ...............................................................10

## STATUTES

18 U.S.C. § 3742 ...................................................................................iv

26 U.S.C. § 7206(2)................................................................................2

28 U.S.C. § 1291 ...................................................................................iv

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over the appeal in this cause under 28 U.S.C. § 1291, which allows for an appeal from a final order of a district court, and 18 U.S.C. § 3742, which permits the appeal of a criminal sentence. This appeal was timely filed on October 31, 2012 within ten days of entry of judgment and sentencing on October 25, 2012.

**STATEMENT OF ISSUE**

Whether the District Court's finding of fact that the United States had established by a preponderance of evidence in sentencing the Defendant to 51 months of imprisonment for twelve (12) counts of aiding and assisting in the filing of materially false federal income tax returns that by relevant criminal or unlawful conduct from 2006-2008 the Defendant had caused tax losses to the United States and the State of Maryland in excess of $2.1 million was clearly erroneous under the extrapolation standards expounded by this Court in *United States* v. *Mehta*, 594 F.3d 277 (4th Cir.), *cert. denied*, 131 S. Ct. 279 (2010).

## STATEMENT OF CASE

Obinna Felix Ukwu was tried and convicted by a jury of twelve (12) counts of aiding or assisting in the filing of materially false income tax returns in violation of 26 U.S.C. § 7206(2), and was sentenced to 51 months imprisonment by the District Court.  The jury verdict omitted findings as to the specific amount of tax losses to the federal government or Maryland caused by the violations.

## STATEMENT OF FACTS

The trial evidence pivoted largely on the Defendant's assisting in the preparation of tax returns which materially misrepresented business losses reported on Schedules C. The evidence, with a few exceptions, was ambiguous or non-existent as to the actual amount of business losses that were falsely reported.[1] Prosecution witnesses generally testified as to the falsity of the exact amounts of business losses claimed. But the witnesses were generally silent or equivocal as to whether lesser business losses had been experienced. In other words, the false Schedules C prepared by the Defendant could have inflated business losses by $10, $100, $1,000, $10,000, or other dollar amount consistent with the jury verdict and the trial evidence. It is impossible to know based on the record. The jury necessarily found only that the Schedules C in the six returns alleged in the Indictment were materially false.

---

[1] J.A. 98, 101, 104-105, 108, 109, 135, 136, 138-139, 145, 146, 185, 186, 187, 188, 189, 197, 198, 206, 224, 225, 229, 232, 233, 234, 239-40, 244, 246, 247, 261, 268, 273, 274, 283-284, 305-306, 309-310, 319-322, 328-329, 389, 394, 398-399, 400, 412, 413, 414, 416, 420, 421, 422, 423, 425, 426, 454, 455, 458, cf 349-350

There was no evidence that the witness-taxpayers who erroneously received tax refunds because of the false filings by the Defendant were required to disgorge their ill-gotten gains to the IRS or volunteered to do so.

A key element in the District Court's sentencing the Defendant to 51 months imprisonment was the finding of fact that the tax loss caused by Defendant's relevant criminal or unlawful conduct exceeded $2.1 million based on an extrapolation methodology employed by the government. (The Presentence Report included a base offense level of 22 based on a tax loss in excess of $1 million and less than $2.5 million). J.A. 522. The District Court stated, "I think the government is correct that its calculation of approximately 2.1 million is a very conservative calculation." The District Court earlier observed:

> Just for the record, I will say I did look at the extensive documentation provided by the government, as well as particularly the Fourth Circuit case of United States versus Mehta, MEHTA at 594 F. 3d 277, from the Fourth Circuit, which had some similarities.
>
> I think to the extent that the Fourth Circuit had any difficulty with the methodology in Mehta, that is overcome in this case, and the method of extrapolation here is reasonable."

J.A. 553.

4

Counsel for the government underscored: "Initially, I think one of the things that is important in this case in terms of fashioning an appropriate sentence gets back to the loss calculation that the government has submitted." J.A. 554.

According to the government's sentencing memorandum, the government assumed that every penny of Schedules C losses claimed by the Defendant from 2006-2008 were fictitious. As noted above, however, the trial testimony was at best inconclusive on that score. J.A. *passim*.

The government also assumed that every inaccurate Schedule C business loss claimed by the Defendant from 2006-2008 was attributable to the Defendant's misconduct, not to mistaken or false information supplied by the taxpayer or negligence. J.A. *passim*.

Most important, the government extrapolated from a trend of tax fraud found in a non-random sample of 18 tax returns with Schedules C prepared by the Defendant to presume the same trend outside the sample contrary to the unambiguous teaching of *Mehta*. J.A. 527

The Defendant prepared 1,105 returns from 2006-2008 with Schedules C business losses. J.A. 527. Prior to the return of the

5

indictment, IRS agents interviewed eighteen (18) single or married taxpayers for whom the Defendant had prepared tax returns during the relevant years. J.A. 526. The eighteen were not a random sample of taxpayers. *The eighteen were specially flagged for examination because their tax returns showed the highest combined Schedule A deductions and Schedule C losses, which the government believed were indicative of probable tax fraud.* J.A. 527. In other words, as in *Mehta*, the sample was chosen by the IRS precisely because they were more likely than other tax returns prepared by the Defendant to be false.

Two of the eighteen taxpayers interviewed stated their Schedule C losses were accurately reported by the Defendant. J.A. 526.

Based upon this tiny skewed sample of eighteen (or less than 2%) of 1,105 tax returns filed by the Defendant from 2006-2008 showing Schedule C losses, the government presumed that 88.88% (16 of 18) of all Schedule C losses reported by the Defendant were entirely concocted. J.A. 526. Drawing on that assumption, the government asserted that the Defendant reported false Schedule C losses collectively for the three tax years in question of $14,604,240, or a total tax loss to the federal government of between $1,460,424 and

6

$3,651,060, depending upon the applicable tax brackets of the taxpayers. *Id.* The government assumed that the lowest possible federal and state tax brackets applied, 10% and 4.75% respectively to calculate a total tax lost figure of $2,154,125. *Id.* at 530.

As a purported check on the reliability of the 88.88 extrapolation percentage, the government analyzed an additional 24 returns at random prepared by Defendant with Schedules C business losses. The government's sentencing memorandum explained:

> "[T]he 1,105 returns were sorted into alphabetical order by first name of the primary taxpayer. Next, every 50th return on that list (or 2% of the total) was selected, resulting in the total of 24 returns. Those 24 returns included 29 different Schedules C. Every single one of those randomly selected Schedules C (100%) listed a large sum for cost of labor expenses and a corresponding loss, with few or no other entries on the Schedule C…These Schedules C were very similar, and in some cases virtually identical, to the Schedules C belonging to the sixteen clients that have been proven to be fraudulent."

J.A. 527-528.

None of the additional 24 returns were audited or resulted in taxpayer interviews or the disgorgement of ill-gotten tax refunds. J.A. *passim.*

7

The District Court accepted the government's extrapolation methodology and tax loss calculation with largely conclusory statements:

> "I think the government is correct that its calculation of approximately 2.1 million is a very conservative calculation. I believe part of the methodology there was to assume that the lowest tax bracket applied. Then this did not include Mr. Ukwu's own return. It didn't include the 2009 tax year.
>
> So we are certainly in, as I said, at least two million, but quite probably more, dollar tax loss to the government. That's very significant."

J.A. 572.

The District Court sentenced the Defendant to 51 months imprisonment based on a total offense level of 24, i.e., a base offense level of 22 based on a tax loss between $1 million and $2.5 million, increased by an additional two levels because the Defendant was in the business of preparing tax returns. J.A. 522.

8

## SUMMARY OF ARGUMENT

The District Court's finding that the Defendant's relevant criminal or unlawful conduct from 2006-2008 caused tax losses to the United States and Maryland exceeding $2.1 million based on the government's extrapolation methodology was clearly erroneous and directly contrary to this Court's teaching in *United States* v. *Mehta.* There, the government's extrapolation methodology was found faulty because the baseline sample employed by the government to impute tax loss outside the sample had been selected precisely because the baseline sample carried earmarks of tax fraud.    This case is indistinguishable. The baseline sample of 18 tax returns showing Schedule C business losses used by the District Court to extrapolate tax losses from the Defendant's entire 1,105 filings with Schedules C were selected precisely because the combined Schedule A deductions and Schedule C losses of the eighteen signaled probable tax fraud to the IRS.  J.A. 526. Moreover, in *Mehta*, the sample size approximated 22% of the universe of tax returns at issue.  Here, the corresponding sample size was less than 2%, and the government provided no expert in statistics to testify or avow that such a miniscule sample size permitted a reliable

extrapolation to the entire 1,105 returns filed by the Defendant from 2006-2008 with Schedules C losses. In *Mehta*, 775 tax returns were audited to determine the incidence of tax fraud. Here, not a single tax return was audited (but for the 18 which generated interviews) in extrapolating the incidence of tax fraud among 1,105 returns containing Schedules C business losses. Finally, here, as in *United States* v. *Schroeder*, 536 F.3d 746 (7th Cir.2008), there was no showing by the government in the 24 returns randomly selected for review that the Schedule C business losses were due to the Defendant's criminal conduct as opposed to negligence or taxpayer mistake or fraud.

When a man's liberty is at stake, the government should turn square corners, not whine about administrative burdens in accurately calculating tax loss caused by the Defendant. According to the government's direct method of calculation, the Defendant caused legally cognizable tax losses of $429,392, which would yield a base offense level of 20, in contrast to the 22 which the District Court employed in sentencing the Defendant to 51 months imprisonment. J.A. 530, 576.

10

The District Court's sentencing order should thus be reversed as irreconcilable with *Mehta*, and the Defendant should be resentenced beginning with a guideline offense level of 22.

# ARGUMENT

The District Court clearly erred in finding that Defendant's criminal or unlawful conduct created tax losses to the United States and Maryland exceeding $2.1 million from 2006-2008 based on the government's extrapolation methodology contrary to the teaching of this Court in *Mehta*. *Mehta* cautioned that "[t]he government bears the burden of establishing the tax loss by a preponderance of the evidence." *Mehta*, at 282 citing to *United States* v. *Butner*, 277 F.3d 481, 487 (4th Cir.2002). Thus, resort is had to an extrapolation methodology to prove tax loss for sentencing, the burden of proof is on the government to establish its reliability.

In *Mehta*, the government proposed a tax loss of $2,508,000. The Court explained:

> The IRS had selected approximately 941 returns for civil audit by scoring each of the Schedule A returns and choosing those most likely to produce additional tax liability. Of these 941, 775 were selected for a correspondence audit, and the remaining returns were accepted as filed. As part of the correspondence audit, the IRS furnished the taxpayers with a computation of what their additional tax liability would be if they did not produce documentation. Approximately 30% of the taxpayers (or 307 returns) signed IRS Form 4549 agreeing to pay the additional tax assessment. The total additional tax liability for these 307 returns was

12

> approximately $473,000, and the average tax assessed
> "per agreed-upon audit" was $1,531.

*Mehta*, 281-282.

The Court added:

> Of the 4,321 Schedule A returns filed, the district
> court considered only 2,500 returns which Mehta filed
> during the last two years of the investigation. The
> court extrapolated the loss for these 2,500 returns. It
> multiplied 2,500 by 30% to equal 750 returns, and
> multiplied 750 by the $1,500 average audited tax loss
> per return to arrive at $1,125,000. Therefore, the court
> calculated a tax loss between $1,000,000 and
> $2,500,000 pursuant to Guideline § 2T4.1, resulting in
> a base offense level of 22. The court applied a two-level
> increase because Mehta was in the business of
> preparing tax returns. U.S.S.G. § 2T1.4(b)(1). The
> Guidelines range for offense level 24 is 51-63 months,
> but the district court varied downward and sentenced
> Mehta to 48 months imprisonment.

*Id.* at 282.

This Court condemned the district court's extrapolation
methodology because it wrongly presumed that the sample tax returns
selected because they carried earmarks of fraud were representative of
all the tax returns filed by the Defendant. This Court elaborated:

> "The problem with this approach is that the 30%
> [fraud] figure [for all the returns during the last two
> years of the investigation] was derived from a non-
> random universe of returns that shared the

13

characteristic of having been identified by a computer program as being more likely to contain errors.

…To extrapolate means to 'to estimate the values of…a function or series…outside a range in which some of its values are known, on the assumption that the trends followed inside the range continue outside it.' [citation omitted]. As the definition indicates, extrapolation in this case would require a threshold finding that the trend in the known sample, namely the average tax loss in the 'flagged for audit' returns , was likely to be present in the larger group of all 2,500 of the Schedule A returns prepared by Mehta during that period. That threshold requirement clearly failed here because the very reason that the 'flagged for audit' returns were flagged in the first place was that they were different from the rest of the larger group."

*Id.* at 263.

The extrapolation methodology endorsed by the District Court in this case fails for the identical reason articulated in *Mehta*. The very reason that the sample of 18 tax returns were selected for review was because they were different from the rest of the larger group of 1,105 tax returns in showing extraordinary Schedule A deductions combined with Schedule C losses. J.A. 527. As the government's sentencing memorandum explains:

"Prior to the return of the indictment in this case, IRS agents interviewed eighteen individuals or married couples…for whom the defendant had prepared tax returns for the 2006 through 2008 tax years. The agents selected these eighteen clients from the

14

> universe of the defendant's clients because these individuals' returns reflected the highest combined Schedule A deductions and Schedule C losses. Included within the group of eighteen clients were those whose returns were the subject of the twelve counts of the Indictment as well as the additional five individuals who testified at trial that the defendant had included false Schedule C information on their returns."

J.A. 526.

As in Mehta, the government flagged the 18 returns for examination and taxpayer interviews precisely because fraud was suspected given the extraordinarily high combined Schedule A deductions and Schedule C losses. J.A. 527. If that were not the case, the IRS agents would simply have pulled 18 returns out of a hat for investigation and follow-up. In such circumstances, Mehta teaches that a tax falsity rate for the entire universe of 1,105 returns showing Schedules C losses filed by the Defendant from 2006-2008 cannot be reliably extrapolated from a falsity trend detected from the 18 returns selected precisely because they were different from the rest.

The fatal flaw under *Mehta* in the government's use of a biased sample to extrapolate tax losses for the whole is not cured by the government's random examination of an additional 24 returns (approximately 1.6% of the universe of relevant returns) showing

15

Schedules C losses. The examinations did not occasion correspondent audits as in *Mehta*. They did not occasion taxpayer interviews. They did not determine whether the losses were the result of the Defendant's negligence or the taxpayer's mistake or fraud. Finally, there was not a crumb of statistical evidence that a miniscule sample size of 1.6% of the universe of tax returns at issue permitted a reliable extrapolation of a trend found within the sample to the 98.4% of the returns outside the sample.

Tacitly recognizing potential problems with its extrapolation methodology, the government's sentencing memorandum also employed a direct method calculation of total tax loss attributable to the sixteen clients who admitted the falsity of their returns. J.A. 530. That total is $429,392, resulting in a base offense level of 20 instead of 22 with the government's extrapolation methodology. Failure of the district court to calculate correctly Sentencing Guidelines range is procedural error. *Gall* v. *U.S.* 552 U.S. 38, 51 (2007). The Defendant accepts the accuracy of the government's direct method calculation, which should be used on remand in resentencing.

16

## CONCLUSION

For the reasons set forth above, the District Court's sentencing of the Defendant to 51 months imprisonment based on the government's flawed extrapolation methodology should be reversed and the case should be remanded for resentencing with a baseline offense level of 20, plus two levels because the Defendant was in the business of tax preparation.

## APPELLANT'S REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument of 15 minutes per side.

Respectfully submitted,

**BRUCE FEIN** (D.C. Bar No. 446615)
BRUCE FEIN & ASSOCIATES, INC.
722 12th St. NW, 4th Floor
Washington, D.C. 20005
(703) 963-4968
bruce@thelichfieldgroup.com
*Counsel for Defendant-Appellant*

18

## RULE 32(A)(7) CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains fewer that 14,000 words. The text of the brief is composed in 14-point Century Schoolbook typeface.

Respectfully submitted,

**BRUCE FEIN** (D.C. Bar No. 446615)
BRUCE FEIN & ASSOCIATES, INC.
722 12th St. NW, 4th Floor
Washington, D.C. 20005
(703) 963-4968
bruce@thelichfieldgroup.com
*Counsel for Defendant-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2013, a true and correct copy of foregoing Opening Brief for Appellant was served upon Appellee's counsel of record listed below via ECF:

Via ECF:

**Kathleen O'Connell Gavin**
Office of the United States Attorney
36 S Charles St Fourth Fl
Baltimore, MD 21201
14102094887
Fax: 14109263091
Email: kathleen.gavin@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Respectfully submitted,

BRUCE FEIN (D.C. Bar No. 446615)
BRUCE FEIN & ASSOCIATES, INC.
722 12th St. NW, 4th Floor
Washington, D.C. 20005
(703) 963-4968
bruce@thelichfieldgroup.com
*Counsel for Defendant-Appellant*

20